In re Shirley **GRAVES**, Debtor,

**FLEET CONSUMER DISCOUNT COMPANY, Appellant,**

v.

**Shirley GRAVES, Appellee.**

Civ. A. No. 92–4488.
Bankruptcy No. 92–12437S.

United States District Court,
E.D. Pennsylvania.

July 13, 1993.

---

F. Lee Jones, Philadelphia, PA, for debtor.

David B. Comroe, Philadelphia, PA, for appellant.

Howard Sparkman, pro se.

**952**

## MEMORANDUM

LOWELL A. REED, Jr., District Judge.

This is a bankruptcy appeal. Appellant Fleet Consumer Discount Company ("Fleet") seeks review of the Order of the bankruptcy court granting judgment in favor of appellee Shirley Graves ("the Debtor"). The U.S. Bankruptcy Court for the Eastern District of Pennsylvania found that Graves was deprived of her constitutional right to due process when she failed to receive personal notice of the sheriff's sale at which Fleet purchased her home.

This Court has jurisdiction pursuant to 28 U.S.C. § 158(a). For the reasons set forth below, I shall affirm the Order of the bankruptcy court.

## I. *FACTUAL AND PROCEDURAL BACKGROUND*

On October 18, 1982, Thomas Bacon ("Thomas"), the Debtor's father, purchased a home located at 6133 Nassau Road, Philadelphia, Pennsylvania, 19151 ("the Home"). Thomas mortgaged the Home to Liberty Bank ("Liberty"). The title of the Home listed Thomas and Duane Bacon ("Duane"), the Debtor's nephew, as joint owners. On January 7, 1986, Thomas died intestate and was survived by his wife Mamie Bacon ("Mamie") and his children, who included the Debtor, her disabled brother Andrew Bacon ("Andrew"), her other brother Norman Bacon ("Norman"), and her sister, Duane's mother. At that time, Mamie, Duane, the Debtor, and Andrew all lived in the Home.

In September 1988, Duane mortgaged his one-half interest in the Home to Fleet without his family's knowledge. Two years later, on September 5, 1990, Mamie died intestate. Duane married and moved out of the Home that same month, leaving the Debtor and Andrew as its sole occupants.

In November 1990, Liberty instituted a foreclosure action against Thomas and Duane [1] in state court because Duane, who had always been in charge of making the

mortgage payments to Liberty, had not made a payment since August 1990. The state-court records of Liberty's foreclosure action show that service was affected on March 11, 1991 on both Thomas and Duane by certified mail and by posting notice of the action of the Home, even though Thomas had since passed away and Duane no longer lived in the Home. These alternative methods of service were permitted pursuant to an Order from the state court. Liberty provided notice of the subsequent sheriff's sale of the Home by posting the notice at the Home and by first-class mail addressed to Thomas and Duane at the Home. Because Liberty was the foreclosing party, it arranged and conducted the sheriff's sale of the Home, which took place on October 7, 1991. Fleet, a junior creditor to whom Duane still owed $12,000, purchased the Home at the sheriff's sale for $41,000 plus $1,000 costs. Fleet contacted the Debtor on October 8, 1991, the day after the sale, to inform her of its purchase of the Home.

Fleet's records suggest that Fleet had contacted the Debtor the first time on June 25, 1991, to find out details about the sheriff's sale. According to Fleet's records, this contact made Fleet aware that Thomas was deceased and that the Debtor claimed to be one of his heirs at law. Fleet believed that this contact also provided the Debtor with actual knowledge and, therefore, notice of the sheriff's sale Liberty had scheduled for October 7, 1991. The Debtor, however, denied any knowledge of the sheriff's sale or any contact with Fleet prior to October 8, 1991, the day after the sheriff's sale. Furthermore, the Debtor claimed that Liberty had never posted notice of the foreclosure action at the Home nor had she received any notice of the impending sheriff's sale.

On November 8, 1991, one month after Fleet purchased the Home at the sheriff's sale, it commenced a state-court ejectment action against the Debtor and her brother Andrew, who were the current and only

---

**1.** Although the Debtor claimed that she had commenced proceedings to administer her father's estate in order to divide up his interest in

the Home among his children, the recorded title remains in the names of Thomas and Duane to this date.

occupants of the Home. A default judgment was entered in favor of Fleet on January 15, 1992.

The Debtor contested the validity of the sheriff's sale and the underlying judgment in Liberty's foreclosure action as well as the default judgment entered against her and Andrew in Fleet's ejectment action. On April 14, 1992, the state court entered an Order denying the Debtor's motion for a stay of execution in the ejectment action, and on May 18, 1992, the state court entered an Order denying relief on the Debtor's motions challenging the validity of the sheriff's sale and the underlying judgment in Liberty's foreclosure action. However, since the Debtor filed an individual Chapter 13 bankruptcy petition on April 22, 1992, the bankruptcy court held that the state-court Order pertaining to Liberty's foreclosure action was void as to her because it violated the statutory automatic stay provisions of the Bankruptcy Code.

On May 12, 1992, Fleet filed a motion with the bankruptcy court asking for relief from the automatic stay. In its motion, Fleet relied solely upon its allegation that the Debtor's ownership interest in the Home was cut off when Fleet purchased it at the sheriff's sale. The bankruptcy judge conducted a hearing on the motion on June 9, 1992, during which he listened to the testimony of the Debtor and Heather Thompson ("Thompson"), the Assistant Branch President of Fleet's Upper Darby office. Thompson presented and interpreted Fleet's file on the Home. At the close of the hearing, the bankruptcy court entered an Order allowing Fleet to reopen the record to add certified copies of the affidavits of service of the complaint, notice of service of the sheriff's sale, and certain other documents from the state-court records in issue on or before June 10, 1992. The Order also allowed both parties to submit any briefs in support of their respective positions by June 17, 1992 and scheduled a subsequent hearing for June 18, 1992 on any motion to reopen the record filed by Fleet.

Fleet timely filed a motion to admit certified copies of certain state-court pleadings into the record, which was granted on June 18, 1992. Fleet also filed a brief in support of its position. The Debtor did not file a brief. On June 25, 1992, the bankruptcy court denied Fleet's motion for relief from the automatic stay and entered judgment against Fleet and in favor of the Debtor. *In re Graves*, 142 B.R. 115, 117 (Bankr. E.D.Pa.1992). The bankruptcy court found that the absence of personal notice to the Debtor violated her state-law and due process rights on three alternative grounds: (1) the Debtor's part ownership interest in the Home, which she inherited after Thomas' death, entitled her to personal notice; (2) the Debtor's extended continuous possession of the Home gave constructive notice to Liberty of the Debtor's interest, which, if investigated, would have revealed the Debtor's partial ownership of the Home; or (3) Fleet's actual knowledge of the Debtor's interest in the Home prior to the sheriff's sale precluded its buying the home as a bona fide purchaser at the sale. Fleet now appeals that Order.

## II. *DISCUSSION*

### A. *Standard of Review*

█ The district court cannot overturn the bankruptcy court's findings of fact unless it finds that they were "clearly erroneous." 11 U.S.C.A. Rule 8013; *Brown v. Pennsylvania State Employees Credit Union*, 851 F.2d 81, 84 (3d Cir.1988). In this case, the bankruptcy court heard testimony from witnesses from both sides. And, as the trier of fact, the bankruptcy court has the best vantage point to determine which party is the most credible because the judge can see and hear from the witnesses himself. *Landon v. Hunt*, 977 F.2d 829, 830 (3d Cir.1992). Legal conclusions of a bankruptcy court, however, are subject to a plenary review on appeal. *Brown*, 851 F.2d at 84.

### B. *Fleet's Appeal*

In its brief to this court, Fleet presents several alternative arguments as bases for this Court to reverse the bankruptcy

court's decision and grant Fleet's request for relief from the automatic stay.

### 1. Applicability of *Res Judicata* and *Collateral Estoppel*

■ Fleet argues that the default judgments in the state-court foreclosure and ejectment actions operate either as *res judicata* or collateral estoppel, thereby precluding the bankruptcy court from relitigating the validity of the notice given, the foreclosure judgment, the sheriff's sale, and the ejectment action. In considering the parties' arguments concerning the preclusive effect of the state-court judgments, I will apply a *de novo* standard of review, making my own legal conclusions without deferential regard to those made by the bankruptcy court.

■ Although Fleet correctly notes that default judgments, absent a showing of fraud, may be given *res judicata* effect, the doctrine will only apply if the second suit presents the same cause of action as the initial suit. *McCarter v. Mitcham*, 883 F.2d 196, 199 (3d.Cir 1989); *Dunham v. Temple University*, 288 Pa.Super. 522, 432 A.2d 993, 999 (1981). The instant action entails a motion for relief from an automatic stay, which is substantively different from an ejectment action. In addition, the doctrine of *res judicata* requires that the party to the second action was a party, or in privity with the parties, to the first action. *McCarter*, 883 F.2d at 199; *Dunham*, 432 A.2d at 999. In this case, the Debtor was not a party to the initial foreclosure action which Liberty brought against Thomas and Duane, nor did any party representing her interests participate therein. Furthermore, since the state-court Order denying the Debtor relief from the foreclosure judgment and execution was entered after the Debtor filed her bankruptcy petition, it violated the automatic stay which accompanied her bankruptcy filing and, therefore, is void. 11 U.S.C. § 362(a)(3) (the filing for bankruptcy stays all attempts to obtain possession of property from the estate of the Debtor).

■ Likewise, the doctrine of collateral estoppel does not apply to this case. In *In re McMillan*, 579 F.2d 289 (3d Cir.1978), the Third Circuit established four requirements that must be met before collateral estoppel can preclude litigation of an issue in a subsequent suit: "(1) the issue sought to be precluded must be the same as that involved in the prior action; (2) [t]hat issue must have been actually litigated; (3) it must have been determined by a valid and final judgment; and (4) the determination must have been essential to the prior judgment." *Id.* at 291–92. As already discussed above, the Debtor did not actually litigate the prior actions, all of which ended in default judgments. Fleet argues that the Debtor need not have actually litigated the issues in the initial actions in order to apply collateral estoppel to a subsequent action so long as the Debtor had a full and fair opportunity to litigate those issues. This argument is without merit. " 'There may be many reasons why the defendant does not wish to contest a suit. ... [A default judgment] should not preclude the litigation of issues not litigated in the defaulted action, whether alleged or not.' " *Id.* at 293 (quoting 1B Moore's Federal Practice ¶ 0.444[2], at 4006–07). Moreover, it is the preponderant view, supported by the Restatement, that a default judgment should not be accorded a collateral estoppel effect. *Id.; see* Restatement of Judgments § 68 cmts. d & e (1942). Since both the state-court foreclosure and ejectment actions resulted in default judgments, it is evident that the Debtor did not actually litigate any issues associated with these cases and, therefore, has not met the requirements mandated by the test for collateral estoppel.

Accordingly, I conclude that the doctrines of *res judicata* and collateral estoppel did not preclude the bankruptcy court from determining the validity of notice to the Debtor.

### 2. *The Debtor's Right to Personal Notice*

The bankruptcy court determined that the Debtor was an heir of Thomas and, as such, took an ownership interest in the Home upon his death in 1986. In addition, the bankruptcy court correctly concluded that, as an owner of the Home, the Debtor

was entitled to personal notice of Liberty's foreclosure action and subsequent sheriff's sale, which the court determined she never received. Lastly, the bankruptcy court properly exercised its equitable powers in evaluating the validity of the sheriff's sale and consequently declaring it void as to the Debtor because it violated her constitutional right to due process of law.

Pennsylvania has enacted several rules to insure that service of notice of a sheriff's sale meets the demands of constitutional due process. In order for a sheriff's sale to be conducted properly, the plaintiff must file an affidavit with the sheriff and serve all parties concerned with notice of the sale. Pa.R.Civ.P. 3129.1(a). These parties, whose names and addresses should be provided in the affidavit, include the owner of the property, the defendant in the judgment, any person with a record lien on the property, any person with a record interest in the property which may be affected by the sale, and any person with an interest not of record which may be affected by the sale and about whom the affiant has knowledge. Pa.R.Civ.P. 3129.1(b). Personal service must be made upon both the defendants in the judgment and those parties listed above. Pa.R.Civ.P. 3129.2(c).

■ As the defendants in Liberty's foreclosure action, Thomas and Duane were entitled to personal notice. Liberty's affidavit provided their names and listed the Home as their address, even though Thomas had died in 1986 and Duane had moved out of the Home in September 1990, over a year before the sale took place.

■ In addition, the Debtor was entitled to personal notice because she inherited Thomas' interest in the Home upon his death and thus became one of its owners. Even though she did not establish an interest of record in the Home after Thomas' death, Liberty, as the foreclosing party, should have included her name in its Affidavit and provided her with personal notice of the sale because (1) her interest in the Home was one that would be affected by the sheriff's sale, and (2) the bankruptcy court found that Liberty had constructive notice of her interest. *See* Pa.R.Civ.P. 3129.1(b)(4).

First, the Debtor's interest in the Home was clearly one that would be affected by the sheriff's sale because whatever interest she gained from her inheritance would terminate upon a subsequent purchase of the Home. Moreover, after the sheriff's sale, Fleet filed an ejectment action asking the court to order the Debtor to surrender the property that Fleet had purchased. Since the Debtor has had to fight to remain on the premises of a property that she partially owns, her interest was unquestionably affected by the sheriff's sale, and it entitled her to personal notice from Liberty.

■ Second, Liberty was legally aware of the Debtor's ownership interest, as she was in clear and open possession of the Home.[2] Such possession generally serves as constructive notice of ownership. *See* *McCannon v. Marston*, 679 F.2d 13, 16 (3d Cir.1982) (clear and open possession of real property serves as constructive notice of ownership of party in possession to subsequent purchasers); *Long John Silver's, Inc. v. Fiore*, 255 Pa.Super. 183, 386 A.2d 569, 573 (1978). This notice, in my judgment, was sufficient to communicate the Debtor's partial interest in the Home to Liberty and should have prompted Liberty to provide the Debtor with personal notice of the foreclosure judgment and the sheriff's sale. Therefore, I hold that the bankruptcy court's finding that Liberty had constructive notice of the Debtor's interest in the Home was not clearly erroneous.[3] And, as a result, the Debtor was entitled to personal notice of the sheriff's sale.

**2.** The Bankruptcy Court elaborated in its discussion: "[s]imilarly, we believe that Liberty, as a judgment creditor, received constructive notice of the interest of the Debtor in the Home in light of her indisputably clear and open possession of the Home since 1982." *Graves,* 142 B.R. at 121.

**3.** To the extent that the issue of whether Liberty had constructive notice of the Debtor's interest is a question of law, I conclude that the underlying findings of fact were undisputed, were not clearly erroneous, and supported the bankruptcy court's holding in this regard.

There is no evidence in the record before me that Liberty attempted to serve the Debtor with personal notice. Nor is there evidence showing that Liberty conducted a proper investigation to locate the Debtor nor evidence explaining the reasons why Liberty could not affect personal service on the Debtor. According to Pa.R.Civ.P. 430(a), a plaintiff may petition the court to provide an alternative to personal service if the plaintiff cannot serve a party personally. The rule requires the affidavit presented in support of the motion for alternative service to state "the nature and extent of the investigation which has been made to determine the whereabouts of the defendant and the reasons why personal service cannot be made." Pa.R.Civ.P. 430(a). As Fleet points out in its brief to this Court, "[t]he purpose of this procedure is to provide proof that a good faith effort has been made to effect service under normal methods. Only after such proof has been offered is the Court authorized to direct publication or another method of substitute service." *Deer Park Lumber, Inc. v. Major*, 384 Pa.Super. 625, 559 A.2d 941, 944 (1988), *appeal denied*, 525 Pa. 582, 575 A.2d 113 (1990).

▬ In accordance with the findings of the bankruptcy court, the record before me shows that Liberty's motion for alternative service by first-class mail and posting of the Home, which the state court approved, pertained only to service upon Thomas and Duane, and not upon the Debtor. Thomas and Duane were the only parties named in the sheriff's certificate of posting, which suggests that they were the only parties with an interest in the Home for whom the state court approved this alternative method of service. In addition, there is absolutely no evidence that Liberty undertook an investigation to locate the Debtor. Such an investigation would have provided a basis for the state court to consider Liberty's motion for alternative service with respect to the Debtor.

Fleet maintains that the notice served on Thomas and Duane was reasonably calculated to give the Debtor notice of the pending litigation and, thus, adequately fulfilled the constitutional due process requirement for notice. *See Romeo v. Looks*, 369 Pa.Super. 608, 535 A.2d 1101, 1105 (1987), *appeal denied*, 518 Pa. 641, 542 A.2d 1370 (1988). Fleet claims that the Debtor was aware of the litigation before the sheriff's sale and, therefore, had a duty to protect her interest in the Home before the sale took place.

▬ The bankruptcy court found, however, that the Debtor had no knowledge of the pending sheriff's sale, nor any other litigation, until October 8, 1991, the day after the sale took place. The bankruptcy judge observed the Debtor, even questioning her himself, and weighed her testimony against the hearsay statements of Fleet employee Donald Nicholas ("Nicholas"), as presented to the court by Heather Thompson ("Thompson"). In doing so, the bankruptcy court found that "[the Debtor's] credibility outweighs the hearsay statements contained in Fleet's records to the contrary." *Graves*, 142 B.R. at 121. Having reviewed the record, including the testimony of the witnesses before the bankruptcy court, I conclude that a reasonable factfinder could infer that the Debtor did not receive the personal notice of the sheriff's sale held on October 7, 1991 until October 8, 1991. Therefore, the bankruptcy court's findings of fact in that regard were not clearly erroneous.

▬ Furthermore, because there was no evidence that Liberty conducted an investigation into whether the Debtor had an interest in the Home, the notice it served on Thomas and Duane was not reasonably calculated to provide the Debtor with notice of the sheriff's sale. And, having failed to provide the Debtor with personal notice of the sale, Liberty did not meet the requirements of Pa.R.Civ.P. 3129.1 and, therefore, deprived her of her constitutional right to due process of law.[4]

---

4. Even if the Debtor had some indirect knowledge of the sheriff's sale prior to October 8, 1991, the sale was still invalid with respect to her ownership interest because Liberty failed to provide her, or attempt to provide her, with personal notice.

As a result, the sheriff's sale which took place was not valid with respect to the Debtor and thus her interest did not terminate upon Fleet's purchase of the Home.

### 3. Fleet's Status as a *Bona Fide Purchaser of the Home*[5]

██ Fleet's next argument challenges the bankruptcy court's finding that Fleet had actual knowledge of the Debtor's identity or ownership interest in the Home prior to the sheriff's sale. Fleet charges that the Debtor's present circumstances are a result of her own inaction and that it bought the Home as a bona fide purchaser for value without notice. Furthermore, Fleet claims that the Debtor failed to heed the notices allegedly posted and mailed to her address and that she should have notified Liberty of her claimed ownership interest in the Home. The bankruptcy court, however, disagreed with Fleet. And, after carefully reviewing the record before me, including all of the testimony from the bankruptcy hearings, I cannot find that the bankruptcy court's findings of fact were clearly erroneous. Therefore, I will not disturb the bankruptcy court's holding that Fleet did not buy the Home as a bona fide purchaser for value without notice.

At the first hearing in the bankruptcy court, Thompson, a Fleet Assistant Branch President, testified on behalf of Fleet and presented all of Fleet's records pertaining to the Home. According to Thompson's testimony, Fleet representative Nicholas contacted the Debtor on June 25, 1991 to question her about the impending sheriff's sale. At that time, Fleet knew that the Debtor was the current occupant of the property. Not only is this fact uncontested, but this particular testimony is detrimental to Fleet's entire case because "clear and open possession of real property constitutes constructive notice to subsequent

purchasers of the rights of the party in possession." *McCannon*, 679 F.2d at 16.

██ Because Fleet had this constructive notice, Fleet was required to investigate whether the possessor claimed to have any legal or equitable interest in the property, even if the possessor failed to record such interest. *Id.; see Long John Silver's, Inc.*, 386 A.2d at 573 (in Pennsylvania, subsequent purchaser takes property subject to rights of possessor, unless purchaser undertook proper inquiry and learned possessor did not claim any ownership interest in property). Such inquiry would be required in order for Fleet to acquire the status of a bona fide purchaser. Contrary to Fleet's charge, it is the duty of the subsequent purchaser to ask about the rights of the possessor, and *not* the duty of the possessor to disclose her rights to the purchaser. *McCannon*, 679 F.2d at 16. In other words, the Debtor did not have to tell Fleet that she had inherited an interest in the Home upon the death of her father, Thomas. Had Nicholas, or any other Fleet employee, asked the Debtor prior to the sheriff's sale whether she had an interest in the Home, Fleet would have learned that she indeed claimed to have inherited an interest from Thomas. Armed with that knowledge, Fleet could have examined the court record, where it would have learned that the Debtor had not received personal service of notice of the sheriff's sale and, therefore, such a sale would be void as to her.

Fleet intended to purchase the Home at the sheriff's sale free from any of the owners' rights in it. It is undisputed in the record that Fleet knew, based either on Nicholas' alleged phone conversation with the Debtor or on her clear and open possession of the property, that the Debtor lived in the Home and had not received notice of the sheriff's sale. Since Fleet intended to be a bona fide purchaser at the sale, the

---

5. In its brief to this Court, Fleet maintains that the bankruptcy court exceeded its authority by considering whether Fleet was a bona fide purchaser at the sheriff's sale. I disagree. Such a decision was essential to determine which party had superior rights in the Home. Fleet also claims that the bankruptcy court improperly

raised this issue *sua sponte*. Again, Fleet is incorrect. In the course of the bankruptcy proceedings, Fleet raised this issue by presenting evidence demonstrating that it knew the Debtor was living in the Home and that she claimed a partial ownership interest in it, but that Fleet failed to investigate her claim to title.

bankruptcy court correctly concluded that it was Fleet's duty to insure that the Debtor had received proper notice of the sale. *McCannon,* 679 F.2d at 16.

Fleet cites *Overly v. Hixson,* 169 Pa.Super. 187, 82 A.2d 573 (1951), to support its argument that the Debtor's possession of the property did not provide Fleet with constructive notice of her ownership interest and, therefore, that Fleet took the Home as a bona fide purchaser for value without notice. *Overly,* however, is easily distinguishable from the instant situation. In *Overly,* Sarah Fox ("Sarah") and Nora Fox ("Nora") stood in a familial relationship[6] to one another and were joint occupants of the property in question. *Id.* 82 A.2d at 574. Christopher Fox ("Christopher") deeded the property to them jointly, but because the deed was not recorded before Christopher's death, Sarah did not gain a recorded interest, as she was not one of his heirs at law. Nora, however, did take a recorded interest in the property through intestate succession. *Id.* The court held that, due to the familial relationship of the occupants, one of whom has a recorded interest in the property, a subsequent purchaser of the property is not given constructive notice of the interest of the other occupant who does not have a recorded interest, nor is the purchaser required to investigate into the rights of the other occupant. *Id.* at 575. Because the purchaser, therefore, will not be imputed with constructive notice of the unrecorded interest, he will attain the status of a bona fide purchaser for value without notice and take the property unencumbered by the interests of any prior owners.

Fleet's attempt to draw a parallel between the present situation and that in *Overly* fails because of one important distinction: the Debtor and her disabled brother Andrew were the only occupants of the Home at the time of the sheriff's sale on October 7, 1991, and neither of them had a recorded interest in it. Duane was the only living interest-holder of record, and he had

moved out of the Home in September 1990. Unlike the situation in *Overly,* none of the occupants of the Home had a recorded interest in it at the time of the sheriff's sale. Since the familial relationship rationale of *Overly* does not apply to this case, the bankruptcy court's finding that Fleet had constructive knowledge of the Debtor's interest in the Home was not clearly erroneous. Therefore, Fleet was not a bona fide purchaser for value without notice, and its interest in the Home will not take priority over that of the Debtor.

## III. *CONCLUSION*

For the foregoing reasons, Fleet's appeal from the June 25, 1992 Order of the bankruptcy court shall be denied, and the Order of the bankruptcy court shall be affirmed.

---

**6.** The exact nature of the familial relationship which existed between Sarah and Nora is un-

clear from the opinion.